UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JOHNSON & JOHNSON CONSUMER                    :
COMPANIES, INC.,                              :
                                              :
                    Plaintiff,                :
                                              :
        -against-                             :         **OPINION AND ORDER**
                                              :
HARRY AINI; JACOB (JACK) AINI; MICHAEL        :         02-CV-6624 (DLI) (RLM)
AINI; RACHEL (RAQUEL) AINI; K.A.K.            :
GROUP, INC., d/b/a INTERNATIONAL              :
BEAUTY EXCHANGE; I.B.E. COSMETICS,            :
INC., d/b/a IBE CORP., INTERNATIONAL          :
BEAUTY EXCHANGE, INTERNATIONAL                :
BEAUTY EXCHANGE, INC; I.C.E.                  :
MARKETING, CORP., a/k/a I.C.E.                :
INTERNATIONAL COSMETICS EXCHANGE              :
MARKETING; CHOUL REALTY, INC.;                :
HOMEBOYS INTERNATIONAL, INC.;                 :
HOMEBOYS DISCOUNT, INC.; BARNEY'S,            :
a/k/a BARNEY'S PHARMACY, a/k/a                :
BARNEY'S COURT CUT RATE; MIMI'S               :
BEAUTY SUPPLY, a/k/a NEO BEAUTY               :
SUPPLY, INC.; OCEAN BEAUTY SUPPLY,            :
a/k/a OCEAN BEAUTY SUPPLY, INC.; ONE          :
STOP BEAUTY, a/k/a ONE STOP BEAUTY            :
SUPPLY, INC.; LUCKY BEAUTY SUPPLY,            :
a/k/a 110 LUCKY STORE INC.; NEW KING'S        :
COSMETICS, INC.,                              :
                                              :
                    Defendants.               :
----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

    Before the Court are a motion and cross-motion for summary judgment arising out of a

trademark infringement action relating to skin care products. The plaintiff, Johnson & Johnson

Consumer Companies, Inc. ("JJCC" or "Plaintiff"), brings this action against numerous defendants

that allegedly sold, distributed, and/or marketed purportedly counterfeit skin care products. Plaintiff

alleges violations of sections 32 and 43(a) of the Trademark Counterfeiting Act of 1984 (15 U.S.C. §§ 1114, 1125, respectively) (the "Lanham Act" or the "Act"); New York General Business Law section 360-l;[1] New York Real Property Law section 231(2); and New York unfair competition and unjust enrichment common law.

Plaintiff now moves for summary judgment, and certain of the defendants cross-move for summary judgment against Plaintiff. For the reasons set forth below, Plaintiff's summary judgment motion is granted in part and denied in part. The summary judgment motion of the cross-moving defendants is denied.

## BACKGROUND

### A.    The Parties

Plaintiff JJCC, a company in the business of selling health and beauty products, owns a line of skin care products under the trade name "AMBI."[2]  (Pl.'s 56.1 ¶ 5.)  At issue in this case are two of the AMBI skin care products:  AMBI Special Skin Discoloration Fade Cream in green packaging ("AMBI Green") and AMBI Extra Skin Discoloration Fade Cream in red packaging ("AMBI Red").

---

[1]Plaintiff brought its claim under New York General Business Law section 368-d, but this provision was repealed in 1997 and re-codified under section 360-l.  *See* N.Y. Gen. Bus. Law § 360-l (McKinney 1999); *see Winner Int'l LLC v. Omori Enters., Inc.*, 60 F. Supp. 2d 62, 73 (E.D.N.Y. 1999).

[2]JJCC purchased the AMBI line of skin care products from the Sara Lee Corporation and its affiliated companies pursuant to an asset acquisition agreement dated November 23, 2004. (Plaintiff's 56.1 Statement ("Pl.'s 56.1") ¶ 6.)  The Sara Lee Corporation and its wholly owned subsidiary Saramar, L.L.C. originally instituted this action, but subsequent to the sale of the AMBI product line, this Court granted JJCC's motion to be substituted as the plaintiff in this action on May 23, 2005.

(Defs.' Resp. 56.1[3] ¶ 29). Plaintiff owns the trademarks registered with the United States Patent and Trademark Office ("USPTO") associated with these two AMBI products: "AMBI" Registration No. 903,176 for skin complexion cream [perfumes and toothpastes] and "AMBI" Registration No. 1,034,597 for cosmetic and toilet preparations, namely deep cleansing cream, facial moisturizing lotion, body moisturizing lotion, make-up base and sun tan oil and lotion. (*See* Defs.' Opp. Memo[4] at 7-8; Pl.'s 56.1 ¶ 29.)

The defendants in this case can be divided into five categories: (1) the "Retail Defendants,"[5] five local retail stores that sold the allegedly counterfeit products (*see* Pl.'s 56.1 ¶¶ 23-27; 32); (2) the "Aini Defendants,"[6] members of the Aini family involved in the sale, distribution, and/or marketing of the allegedly counterfeit products (*see* Pl.'s 56.1 ¶¶ 7-10; 13; 15; 17; 19; Defs.' Resp.

---

[3]"Defs.' Resp. 56.1" refers to the document entitled "Aini Defendants' Response to Plaintiff's Statement of Fact Pursuant to Local Rule 56.1."

[4]"Defs.' Opp. Memo" refers to the document entitled "Aini Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment."

[5]Lucky Beauty Supply; Mimi's Beauty Supply; Ocean Beauty Supply, a/k/a/ Ocean Beauty Supply Inc.; Barney's, a/k/a Barney's Pharmacy, a/k/a Barney's Court Cut Rate; and One Stop Beauty, a/k/a One Stop Beauty Supply, Inc.

[6]Harry Aini ("H. Aini") is the president and sole shareholder of IBE. (Pl.'s 56.1 ¶ 13.) H. Aini's brother, Michael Aini ("M. Aini"), is the president, sole shareholder, and only full-time employee of ICE. (Pl.'s 56.1 ¶ 15; M. Aini Deposition ("Depo.") Transcript ("Tr.") at 31:21-22.) A second brother, Jacob (Jack) Aini ("J. Aini"), is employed by or works with IBE and/or ICE as a sales consultant and/or buyer. (Pl.'s 56.1 ¶ 19; Defs.' Resp. 56.1 ¶ 19.) Rachel (Raquel) Aini ("R. Aini"), is J. Aini's wife and is/was allegedly a buyer/manager of ICE and Homeboys International, Inc. and Homeboys Discount, Inc. (Pl.'s 56.1 ¶ 10; "Plaintiff's Memorandum of Law in Opposition to ICE Defendants' Motion for Summary Judgment" ("Pl.'s Opp. Memo") at 9.)

56.1 ¶¶ 13, 19); (3) "IBE,"[7] "ICE,"[8] and "Homeboys,"[9] New York distributors and retailers of the allegedly counterfeit products, owned and operated by certain of the Aini Defendants (*see* Pl.'s 56.1 ¶¶ 11-12, 14, 21; Defs.' Resp. ¶¶ 11, 21); (4) New King Cosmetics, Inc. ("New King"), a New York distributor of the allegedly counterfeit products, not affiliated with the Aini Defendants (*see* Pl.'s 56.1 ¶ 22); and (5) Choul Realty, Inc. ("Choul"), a New York real estate corporation owned and operated by M. Aini that, in turn, owns an office/warehouse space in Maspeth, New York, occupied by IBE and ICE (*see* Pl.'s 56.1 ¶¶ 16, 18; Defs.' Resp. 56.1 ¶ 18).

Plaintiff brings its summary judgment motion against all of the above-listed defendants except R. Aini ("Defendants"). ICE, J. Aini, M. Aini, and R. Aini cross-move for summary judgment against Plaintiff.

## B.    AMBI Green and AMBI Red Products

AMBI Green and AMBI Red are skin bleaching products that are part of a skin care line marketed to consumers with dark complexions. (*See* Defs.' Resp. 56.1 ¶ 29.) AMBI Green and Red products are currently manufactured in the United States for export only.[10] (Tr. Oral Arg. at 21:20

---

[7]I.B.E. Cosmetics, Inc., d/b/a IBE Corp, International Beauty Exchange, International Beauty Exchange, Inc.; and its predecessor K.A.K. Group, Inc., d/b/a/ International Beauty Exchange

[8]I.C.E. Marketing, Corp., a/k/a I.C.E. International Cosmetics Exchange Marketing

[9]Homeboys International, Inc. and its predecessor Homeboys Discount, Inc.

[10]The court has received new information suggesting that AMBI Green and Red may no longer be manufactured in the United States. (*See* 6/25/2007 John Hughes ("Hughes") Affidavit ¶ 6.)

to 22:1;[11] Defs.' Resp. 56.1 ¶ 54.)  A prior version of AMBI Green and a prior version of AMBI Red

(respectively, "Jamaica AMBI Green" and "Jamaica AMBI Red") were manufactured in a Jamaican

factory owned by the Sara Lee Corporation until the factory closed in 1997.[12]  (Pl.'s Reply Memo[13]

at 6.)  The exclusive authorized distributor of Jamaica AMBI Green and Red was Kiwi Products,

then a division of the Sara Lee Corporation.[14]  (Pl.'s 56.1 ¶ 53; Tr. Oral Arg. at 3:9-14.)  Although

the Sara Lee Corporation and its affiliates ("Sara Lee") sold other AMBI products in the United

States, they never sold any version of AMBI Green or Red domestically.  (Pl.'s 56.1 ¶ 54, 56; Defs.'

Resp. 56.1 ¶ 54, 56.)

## C.    Purchase and Sale of Allegedly Counterfeit AMBI Green and AMBI Red

Prior to 1996, IBE and New King regularly purchased AMBI products, other than AMBI

Green and Red, from Kiwi Products.  (Defs.' Opp. Memo. at 3.)  However, because customers

specifically requested AMBI Green and Red, and IBE and New King were unable to purchase these

products from Kiwi Products, the distributors looked to other possible sources.  (*Id.*)

---

[11]"Tr. Oral Arg." refers to the transcript of oral argument held before the court on May 4, 2007.  "21:20 to 22:1" refers to page 21, line 20 to page 22, line 1.

[12]AMBI Green and Red products were apparently manufactured in factories in other countries as well.  (John Hughes ("Hughes") Depo. Tr. at 23:16 to 24:3.)  However, it seems that none of these products were distributed in the United States (*see* Hughes Depo. Tr. at 23:1-24:3), and Defendants do not claim that the allegedly counterfeit products at issue here were manufactured in any factories outside of Jamaica.

[13]"Pl.'s Reply Memo" refers to the document entitled "Plaintiff's Reply Memorandum of Law in Support of Motion for Summary Judgment Against IBE Defendants and Retail Defendants."

[14]Defendants contest that Kiwi Products was the exclusive distributor of Jamaica AMBI Green and Red.  (Tr. Oral Arg. at 3:23 to 4:4.)  Notwithstanding, it is clear that Kiwi Products was the exclusive *authorized* distributor of Jamaica AMBI Green and Red. (*See* Pl.'s 56.1 ¶ 53.)

From about 1996 to 2002, IBE and New King allegedly obtained Jamaica AMBI Green and Red through purchases and/or product exchanges with two local sellers: (1) Felix Poblah ("Poblah"), a Caribbean street vendor located in Florida who allegedly delivered Jamaica AMBI Green and Red products to Defendants in suitcases, and (2) Infinity Products, Inc., a now-defunct wholesaler of ethnic cosmetics that ceased doing business in May 2001. (Pl.'s 56.1 ¶ 56; Defs.' Opp. Memo at 3-4; Pl.'s New King Memo[15] at 7.) During the same period, New King also allegedly sold Jamaica AMBI Green and Red to IBE. (*Id.*) Plaintiff contests that IBE and New King received any Jamaica AMBI Green and Red from Poblah and Infinity, and further contests that IBE received said products from New King. (Pl.'s Memo[16] at 11-15.) It is Plaintiff's contention that the products Defendants purchased and sold were counterfeit. (*Id.*)

## D. Discovery of Allegedly Counterfeit AMBI Green and AMBI Red Products

Sara Lee discovered the allegedly counterfeit products through a search and seizure of IBE and ICE's shared warehouse carried out in connection with a separate trademark infringement action currently pending in this district, *Martal Cosmetics, Ltd. v. Int'l Beauty Exchange Inc.*, 01-CV-7595 (RRM) (JO) (E.D.N.Y.) (referred to hereafter as the "*Martal* action"). (Pl.'s 56.1 ¶ 48.[17]) A

---

[15]"Pl.'s New King Memo" refers to the document entitled "Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment Against New King Cosmetics, Inc."

[16]"Pl.'s Memo" refers to the document entitled "Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment Against IBE Defendants and Retail Defendants."

[17]In their response to Plaintiff's 56.1 statement, Defendants indicate that they disagree with the facts as set forth in paragraph 48 of Plaintiff's 56.1 statement, by writing the word "Disputed." However, Defendants do not explain what facts in paragraph 48 they dispute; nor do they offer any reason as to why they dispute Plaintiff's facts. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).") In

videotape of the search (the "*Martal* videotape") revealed a number of shipping boxes in the warehouse labeled "ambi original," some with green lettering and some with red lettering.[18] (Pl.'s 56.1 ¶ 49.) Sara Lee never manufactured a product called "ambi original," nor did it use shipping boxes printed with these words. (*Id.*; Defs.' Resp. 56.1 ¶ 49; Ian Plane ("Plane") Depo. Tr. at 263:13 to 264:17.) The search and seizure also revealed a price list with the words "Jamaican AMBI Green" and "Jamaican AMBI Red" printed among the listed items.[19] (Pl.'s 56.1 ¶ 51.) Sara Lee never manufactured products bearing these names. (*Id.*)

Sara Lee subsequently commenced an investigation in July 2002. (Pl.'s 56.1 ¶ 35.) Undercover investigators purchased the allegedly counterfeit AMBI Green and Red products from each of the Retail Defendants' stores, as well as from Homeboys. (*Id.* ¶ 36.) Neither party disputes that, to the untrained eye, the AMBI products purchased by the investigators are nearly identical to

---

any event, Plaintiff's assertions about how Sara Lee discovered Defendants' purchase and sale of allegedly counterfeit AMBI Green and Red are facts solely within Plaintiff's knowledge. Accordingly, this court accepts Plaintiff's facts relating to how Sara Lee discovered Defendants' alleged violations.

[18]Defendants argue that the *Martal* videotape is inadmissible because of the confidentiality provision in United States District Judge John Gleeson's preliminary injunction order dated December 11, 2001, issued in the *Martal* action, which states that, "since the documents and other items seized on November 20, 2001 may contain confidential or other nonpublic commercial and financial information, said items shall only be used for the purpose of prosecution, defense or settlement of this action and for no other purpose." (*See* Defs.' Exhibit ("Exh.") 28.) It is plain that the confidentiality provision only applies to documents and items "seized." The videotape was not seized during the search and seizure in the *Martal* action. Accordingly, Defendants' request that this court suppress the videotape is denied.

[19]Defendants argue that the price list should be suppressed because of the confidentiality provision in the *Martal* seizure order quoted in footnote 17, *supra*. Decision on this issue is not immediately necessary; the price list is mentioned here merely to describe how Plaintiff discovered the allegedly counterfeit products. Accordingly, the court defers its ruling on this issue until such time that it becomes necessary.

the genuine AMBI Green and Red products. (Defs.' Opp. Memo at 21; Pl.'s Memo at 4.) Upon closer examination, however, several differences in the packaging and in the composition of the allegedly counterfeit products, as compared to the genuine products, are apparent.[20] (*Compare* Pl.'s Exhs. 22 and 23 *with* Pl.'s Supplemental ("Suppl.") Exhs. A and B.) Sara Lee further discovered, based on tests conducted on products purchased from Homeboys, that the allegedly counterfeit AMBI Green and Red products contained only trace amounts (0.03-0.04%) of the active skin bleaching ingredient hydroquinone, in contrast with 2% hydroquinone levels in the genuine products. (Pl.'s 56.1 ¶ 46;[21] Hughes Depo. Tr. 36:9 to 37:4 and 38:5-22.)

## E.    Procedural History

Sara Lee commenced this action on December 19, 2002, seeking, by Order to Show Cause, an *ex parte* seizure order, a temporary restraining order, and a preliminary injunction against the Retail Defendants. On December 20, 2002, United States District Judge John Gleeson entered an order granting Sara Lee's motion and, on February 6, 2003, further issued, upon motion by Sara Lee, an Order to Show Cause for a temporary restraining order and preliminary injunction against the remaining defendants. On February 18, 2003, IBE, New King, and Homeboys entered into a Consent Preliminary Injunction Order, agreeing to cease distribution of AMBI Green and Red. On

---

[20]*See* "Discussion" section B.1, *infra*, for a list of the differences.

[21]In their response to Plaintiff's 56.1 statement, Defendants indicate that they disagree with the facts as set forth in paragraph 46 of Plaintiff's 56.1 statement by writing the word "Disputed." Defendants then proceed to challenge John Hughes' knowledge of the day-to-day business at the Jamaican factory but do not respond to Plaintiff's assertion that the counterfeit AMBI Green and Red purchased from Homeboys contained 0.03-0.04% levels of hydroquinone. Accordingly, Plaintiff's assertion regarding hydroquinone levels is deemed admitted.

May 23, 2005, this court granted JJCC's motion to be substituted as the plaintiff.[22]

Following extensive discovery, Plaintiff filed a motion for summary judgment against IBE, ICE, Homeboys, Choul, and the Aini Defendants (excluding R. Aini), and a separate motion for summary judgment against New King and the Retail Defendants, seeking permanent injunctive relief and statutory and compensatory damages. ICE, J. Aini, M. Aini, and R. Aini, in turn, filed a cross-motion for summary judgment to dismiss Plaintiff's complaint against them.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 1776.

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury

---

[22]*See, supra,* n.2.

could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted).

## B.     Trademark Infringement and Unfair Competition Claims under the Lanham Act

Plaintiff alleges claims of trademark infringement and false descriptions and representations in commerce under sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125, respectively. Section 32 of the Lanham Act imposes civil liability on

> [a]ny person. . . [who] without the consent of the registrant–(a) use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale. . . of any goods or services in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1). Similarly, section 43(a) of the Lanham Act imposes civil liability on

> [a]ny person who, on or in connection with any goods . . . uses in commerce any word, term, name, [or] symbol . . . or any . . . false or misleading description of fact, or false or misleading representation of fact, which–(A) is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods . . . by another person.

15 U.S.C. § 1125(a)(1). Under both provisions, the registrant need not prove intent in order to succeed on the issue of liability and procure injunctive relief. 15 U.S.C. §§ 1114(1)-(2), 1125(a); *see also El Greco v. Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986). However, in order to obtain maximum statutory damages under 15 U.S.C. § 1117(c), as Plaintiffs here seek, the registrant must prove that Defendants acted willfully. *See* 15 U.S.C. § 1117(c)(2).

### 1.     Threshold Issue:  Genuineness of the AMBI Green and Red Products

Defendants argue that they are not subject to the remedial provisions of the Lanham Act because the AMBI Green and Red products they sold ("Defendants' products") were not counterfeits

of the AMBI Green and Red products for which Plaintiff seeks trademark protection ("actual products" or "Plaintiff's products").  Defendants claim instead that their goods are genuine AMBI Green and Red products, albeit prior versions of Plaintiff's products, manufactured in Jamaica. Plaintiff contends that the allegedly counterfeit products cannot be prior versions of their products.

The Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.  Under the facts and circumstances presented to the court, this definition does not shed much light.  Neither party in this action disputes that, to the untrained eye, Defendants' packaging containing the mark in question was nearly identical to Plaintiff's.  Accordingly, Defendants are subject to the terms of the Lanham Act unless their products can be deemed "genuine," as they claim.

The threshold legal issue here is whether a prior version of a product can be considered a "counterfeit" of its successor under the Lanham Act.  A review of the case law in this area reveals that this precise issue has not yet been addressed by the Second Circuit or by any other circuit. However, the Second Circuit has ruled on the application of the Lanham Act to gray market goods, which are "goods made by a foreign manufacturer, legitimately sold abroad under a particular trademark[,] . . . imported into the United States and sold in competition with goods of the owner of [the United States] trademark rights in the identical mark." *Curtis v. Nat'l Wholesale Liquidators, Inc.*, 890 F. Supp. 152, 154 (E.D.N.Y. 1995) (internal quotation marks omitted, citation omitted, bracketed text in original).  The issue here as to whether the allegedly counterfeit products are genuine arises in the same context as gray market goods, as both involve products allegedly manufactured for the complaining party, purportedly bearing an authentic trademark, and distributed in geographic areas where they were not intended for sale.  Accordingly, to resolve the instant issue,

the court looks to the Second Circuit's analysis in cases involving gray market goods.

Trademark law does not prohibit the sale of genuine goods, even if the goods are sold without the trademark owner's consent. *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992). However, the Second Circuit has held, in a gray market goods case, that a product cannot be considered "genuine" if (1) it was not intended for sale in the United States and (2) it differs materially from the actual good. *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987); *see also Curtis*, 890 F. Supp. at 158. This court finds it appropriate to apply the gray goods test for genuineness to determine whether a prior version of a product is a counterfeit of its successor under the Lanham Act.

Applying the first prong of the test, it is undisputed that AMBI Green and Red were not intended for sale in the United States. While Sara Lee sold other AMBI products domestically, it deliberately withheld its AMBI Green and Red products from the domestic market, selling these particular products only abroad.

Applying the second prong, the allegedly counterfeit versions differ materially from the actual, current versions of the products at issue (*i.e.*, those currently manufactured in the United States). The standard for whether an allegedly counterfeit product is materially different from a trademarked good is whether there exists "any difference between the registrant's product and the allegedly infringing . . . good that consumers would likely consider to be relevant when purchasing a product." *Curtis*, 890 F. Supp. at 159 (quoting *Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992)).

The following chart lists the differences between the allegedly counterfeit products and the actual, current versions of the products, based on a comparison of the packaging unless otherwise

indicated.  (*Compare* Pl.'s Exhs. 22 and 23 *with* Pl.'s Supplemental ("Suppl.") Exhs. A and B.)

| | U.S. Authentic Products | Alleged Counterfeits |
|---|---|---|
| Ingredients | • 2% hydroquinone content (active skin bleaching ingredient)<br>• Sodium *Metabisulfite* listed on packaging as an ingredient | • 0.03-0.04% hydroquinone content[23]<br>• Sodium *Sulfate* listed on packaging as an ingredient on AMBI Red (AMBI Green packaging lists Sodium Metabisulfite) |
| Outer Box Packaging | • Declared weight is 1.5 ounces (42.5 grams)<br>• Bears expiration date and batch code<br>• Contains a drug interaction warning and a general warning<br>• Contains a "Keep Out of Reach Of Children" notice<br>• Contains directions for use<br>• Bears UPC code<br>• Lists ingredients on back panel<br>• Words written in English and *Spanish*<br>• Front panel reads "SKIN DISCOLORATION FADE CREAM WITH VITAMIN E & SUNSCREEN"<br><br>• Lettering of "ambi" mark on front panel is in simple bold font<br><br>• Box top has a stylized "a"<br><br>• Rear panel reads "Distributed by: AMBI Products Douglassville, PA 19518-1239" | • Declared weight is 1.6 ounces (45 grams)<br>• No expiration date or batch code<br>• No drug interaction warning and limited general warning<br>• No "Keep Out of Reach Of Children" notice<br>• No directions for use<br>• No UPC code<br>• Lists ingredients on side panel<br>• Words written in English and *French*<br>• Front panel reads "SKIN TONING CREAM MADE IN JAMAICA/FABRIQUE EN JAMAIQUE CREME TONIFIANTE POUR LA PEAU"<br>• Lettering of "ambi" mark on front panel is in a thicker font with the letter "i" dotted with a crown<br>• Box top depicts "ambi" mark with the letter "i" dotted with a crown<br>• Rear panel reads "KIWI CARIBBEAN LTD. 40A OLD HOPE RD., P.O. BOX 339, KGN. 5 JAMAICA W.I." |
| Tube packaging | • Bears expiration date and batch code<br>• Diameter of cap is 2 centimeters | • No expiration date or batch code<br>• Diameter of cap is 1.2 centimeters |

Not all of the differences listed in the chart above would cause a consumer to think twice about

_____

[23]This is the amount of hydroquinone discovered in the allegedly counterfeit AMBI Green and Red obtained from Homeboys.

buying one product over the other. However, at least a few of the differences clearly would be important to the consumer making a purchase decision. First and foremost, the difference in hydroquinone content between the products is significant because hydroquinone is the active skin bleaching ingredient in the AMBI Green and Red products. The fact that there are only trace amounts of hydroquinone in the allegedly counterfeit versions is something a customer seeking to purchase these products to even out his or her skin tone would want to know.

Second, the fact that the packaging of Plaintiff's products–but not Defendants' products–bears expiration dates and batch codes is also significant. John Hughes, a quality assurance manager for Sara Lee during the period that Jamaica AMBI Green and Red products were manufactured in Jamaica ("the relevant period of manufacture"), testified that Jamaica AMBI Green and Red products had an expiration of eighteen months after manufacture.[24] (Hughes Depo. Tr. 98:12-17.) After the expiration date, Hughes stated, the AMBI Green and Red products would, once opened, oxidize, turn brown, begin to leak, and corrode the tube. (Hughes Depo. Tr. 100:19) A prospective consumer of these products would certainly want to know when they expire in order to avoid any ill effects of using the cream after the expiration. Furthermore, batch codes are an important means for manufacturers to control the quality of their products; in the event of a recall, batch codes enable manufacturers to identify the products to be recalled. The absence of such batch codes further supports a finding that there are material differences between the Plaintiff's and Defendants' products. *See John Paul Mitchell Sys. v. Pete-N-Larry's*, 862 F. Supp. 1020, 1027 (W.D.N.Y. 1994) (denying in part the defendants' motion for summary judgment in a gray market

---

[24]At oral argument, Defendants' counsel conceded that the court should credit Hughes' testimony. (Tr. Oral Arg. at 28:7-10.)

goods case, finding, *inter alia*, that the physical obliteration of batch codes created differences between the gray good and the genuine product sufficient to raise a material issue of fact concerning genuineness); *see also El Greco Leather Prods. Co.*, 806 F.2d at 395 (stating that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark").

Finally, the fact that the packaging for the allegedly counterfeit products do not contain various warnings to the consumer that are listed on Plaintiff's packaging is also materially significant. The following two consumer warnings are listed on Plaintiff's packaging but not on Defendants' packaging:

> Drug Interaction: Do not use this product in combination with externally applied products containing resorcinol, phenol or salicylic acid unless directed by a doctor.

> Keep Out of Reach of Children

(*Compare* Pl.'s Exhs. 22 and 23 *with* Pl.'s Supplemental ("Suppl.") Exhs. A and B.) Furthermore, Plaintiff's packaging also contains the following general warning that is not entirely replicated on Defendants' packaging:

> WARNINGS: Avoid contact with eyes. Some users may experience a mild skin irritation or temporary darkening. If irritation becomes severe or darkening persists, stop use and consult a doctor. If no improvement in the skin tone is seen after 3 months, discontinue use. Do no[t] use on children under 12 unless directed by a doctor. This product is not for use in the prevention of sunburn.

(*Id.*) Defendants' packaging contains a more limited general warning that, while similar to the preceding warning, does not mention the following: (1) that a possible side effect is temporary darkening, (2) that users should discontinue use if there is no improvement in skin tone after three months, and (3) that the product is not for use in the prevention of sunburn. (*See* Pl.'s Exhs. 22 and

23.)

Each of the three warnings listed on Plaintiff's packaging may be important to a potential consumer in making his or her purchase decision. A consumer may decide not to purchase the product after reading that it could cause a temporary darkening of the skin, that the product should be kept out of the reach of children, or that the product should not be used in combination with certain other products containing commonly used ingredients such as salicylic acid and others. The absence of such warnings is further significant because of the product liability implications for Plaintiff, in the event that these products cause consumers injuries that could have been prevented with warning labels.

Accordingly, Defendants' allegedly prior versions of AMBI Green and Red products materially differed from Plaintiff's versions. Thus, under the Second Circuit test for genuine goods, the allegedly prior versions cannot be considered "genuine" under the Lanham Act and, consequently, are deemed "counterfeit."

The court notes that the parties spent a considerable portion of their submissions debating the factual issue of whether Defendants' products conceivably can be prior versions of Plaintiff's products to begin with. As this court finds that Defendants' products are counterfeit, even if they are prior versions as Defendants argue, this issue is moot. Notwithstanding, the court notes that the evidence in the record does not support Defendants' contention that their products are prior versions of Plaintiff's products. Plaintiff's factory in Jamaica that produced Jamaica AMBI Green and Red closed down in 1997. The products at issue were purchased in 2002, about five years after the factory closed. As mentioned earlier, Jamaica AMBI Green and Red products had a shelf life or expiration date of eighteen months after manufacture, and, if opened after the expiration date, the

products would oxidize, turn brown, begin to leak, and corrode the tube. Furthermore, Defendants' products only contain trace amounts of hydroquinone, whereas Plaintiff's Jamaica products contained 2% levels of hydroquinone. In addition, there are several differences in design, wording, and spelling between the packaging of the allegedly counterfeit products and Jamaica AMBI Green and Red. (*Compare* Pl.'s Exhs. 22 and 23 *with* Defs.' Hughes Exhs. 3 and 4.[25]) Although Defendants allege that, at some point, the packaging of Jamaica AMBI Green and Red products contained some of the same misspellings and grammatical errors Defendants' products contain, based on the facts and on the court's comparison of the packaging, it is plain that no reasonable factfinder could find that the products Defendants sold were the Jamaica versions of Plaintiff's products. Accordingly, even viewing the facts in the light most favorable to the nonmoving party, Defendants have not raised an issue of fact concerning the genuineness of their products, which, regardless of the theory on which Defendants proceed, is "counterfeit" for the purposes of the Lanham Act.[26]

---

[25]"Defs.' Hughes Exhs." are exhibits to the 11/16/2005 affidavit of John Hughes, located in Defendants' Exhibit 9. The court did not receive actual, physical samples of Jamaica AMBI Green or Red. Instead, the parties submitted photocopies of the outer packaging of these two items, which the court considered. (*See* Defs.' Hughes Exhs. 3 and 4.) At oral argument, Defendants' counsel suggested that the unavailability of physical samples of the Jamaica products supported his argument that Defendants' products could be prior versions of Plaintiff's products, simply by virtue of the fact that one could not definitively answer the question in the absence of actual samples. (*See* Tr. Oral Arg. at 23:25 to 24:7.) Plaintiff's counsel aptly rejoined that Plaintiffs did not retain any samples of Jamaica AMBI Green or Red because any such samples would have long expired–well before Plaintiffs discovered Defendants' dealing in allegedly counterfeit products–and were discarded as no longer fit for use. (*See* Tr. Oral Arg. at 26:25 to 27:4.) In any event, Defendants are incorrect in their belief that the mere speculative possibility that their products could be prior versions of Plaintiff's products suffices in itself to raise an issue of fact in this regard.

[26]Interestingly, defense counsel proceeded on the same "prior version" theory in the *Martal* trademark infringement action, which involves many of the same defendants as in this

## 2. Elements of Trademark Infringement Claim under the Lanham Act

In order to prevail on a trademark infringement claim under sections 32 and 43(a) of the Lanham Act (15 U.S.C. §§ 1114 and 1125(a), respectively), Plaintiff must demonstrate the following two elements: (1) that Plaintiff is the owner of a valid trademark and (2) that there is a likelihood of confusion by consumers. *Pfizer, Inc., v. Y2K Shipping & Trading, Inc.,* No. 00 CV 5304, 2004 WL 896952, at *2 (E.D.N.Y. Mar. 26, 2004) (citing *Time, Inc. v. Petersen Publ'g Co. L.L.C.,* 173 F.3d 113, 117 (2d Cir. 1999)). In addition, Plaintiff must show that Defendants used its mark in commerce. *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1).

### a. Ownership

It is undisputed that Plaintiff owns the marks at issue.[27] Defendants nevertheless allege that the trademarks are unenforceable due to Plaintiff's inaccurate identification of the goods in the registered description of the products. However, once a mark is recorded with the USPTO, the registration requirements are assumed to be met, and the mark is entitled to protection. *See* 15 U.S.C. § 1057(b); *see also, e.g., In re Colgate-Palmolive Co.,* 152 U.S.P.Q. 518 (T.T.A.B. 1966); *In re Dynamit Nobel Aktiengesellschaft,* 169 U.S.P.Q. 499 (T.T.A.B. 1971). A defendant may rebut the presumption of a plaintiff's right to exclusively use a trademark by a preponderance of the evidence. *PaperCutter, Inc. v. Fay's Drug Co.,* 900 F.2d 558, 563 (2d Cir. 1990). Defendants contend that

---

case. However, the theory was rejected by Magistrate Judge James Orenstein on the ground that it was the defendants' attempt to cast "metaphysical doubt" on the plaintiff's strong evidence that the defendants' product was counterfeit. *See* Report and Recommendation 30 in *Martal Cosmetics, Ltd. v. Int'l Beauty Exch. Inc.,* CV 01-7595 (SJF) (JO), (E.D.N.Y. Sep. 22, 2006), adopted in pertinent part and modified in part by No. CV-01-7595(SJF)(JO), 2007 WL 895697 (E.D.N.Y. Mar. 22, 2007).

[27]*See, supra,* n.2.

Plaintiff should have used descriptive words such as "fade cream," "bleaching cream," or "whitening cream" instead of "skin complexion cream," "cosmetic and toilet preparations," "deep cleansing cream," and "facial moisturizing lotion." However, Defendants' bare assertions are insufficient to overcome the presumption that Plaintiff's marks are entitled to protection.

Defendants further argue that Plaintiff's trademarks are unenforceable because Plaintiff, through the testimony of John Hughes and Ian Plane, a business development director during the relevant period of manufacture, allegedly admitted that illegal levels of the active skin bleaching ingredient hydroquinone were used in Plaintiff's AMBI Green and Red products. The court has thoroughly reviewed those portions of Hughes' and Plane's deposition testimonies referenced by Defendants, but did not find a single statement to support Defendants' claim. To the contrary, the testimony that Defendants cite in support of their allegation reflects instead that Plaintiff reduced the level of hydroquinone content in their AMBI Green and Red products to 2% in or around 1982 in order to comply with a U.S. Food and Drug Administration tentative final monograph issued that year that regulated hydroquinone levels in over-the-counter skin bleaching products. *See* 47 Federal Register 39108, Sept. 3, 1982. (Hughes Depo. Tr. at 36:9 to 37:4 and 38:5-22; Plane Depo. Tr. at 51:5 to 56:25.) Defendants' blatantly improper efforts to distort the record do not raise a serious challenge to Plaintiff's ownership of the marks.[28]

---

[28]At oral argument on the instant motion, after being admonished by the court not to make misrepresentations to the court, defense counsel again attempted to reiterate his misrepresentation of the record concerning the hydroquinone content in Plaintiff's products. (Tr. Oral Arg. at 25:1-14; 39:9-18.) Defense counsel, as it turns out, has a history of less-than-candid representations to a court of law. This court notes that defense counsel has been sanctioned for unbecoming conduct twice in years past: first, in the *Martal* action, in a Report and Recommendation dated September 5, 2002 issued by United States Magistrate Judge Aaron Simon Chrein (adopted by District Judge Gleeson on March 28, 2003) for proffering a false argument (*see* Pl.'s Exh. 56) and, second, in a decision issued in the Southern District of Florida,

###### b. Likelihood of Confusion

In analyzing the likelihood of confusion prong of the trademark infringement test, courts apply the non-exclusive multi-factor test developed by Judge Henry Jacob Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), and examine: (1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products and their competitiveness with one another, (4) actual confusion, (5) the likelihood of plaintiff's "'bridging the gap' by developing a product for sale in the market of the alleged infringer's product," (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers. *See, e.g., Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005); *Brennan's, Inc. v. Brennan's Rest.*, 360 F.3d 125, 130 (2d Cir. 2004); *Pfizer, Inc.*, 2004 WL 896952, at *3. The courts analyze these factors through the eyes of the ordinary purchaser "buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Pfizer, Inc.,* 2004 WL 896952, at *6 (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)).

There is no dispute concerning the similarity of the marks factor. Defendants concede that the packaging of their products was nearly identical to that of Plaintiff's products. Furthermore, the competitive proximity and bridging the gap factors are irrelevant to the analysis of this case. The products were not in competitive proximity; consumers apparently believed Defendants' products actually were Plaintiff's products. Accordingly, there was no gap to bridge in the market.

---

*Int'l Beauty Exch., Inc. v. Tony Dollar Kingdom, Inc.*, No. 01-0524-CIV, 199 F.R.D. 700 (S.D. Fla. 2001), for violating a duty of candor. Suffice it to say that defense counsel's conduct here flirts with the same fate.

### (1)     Strength of the Mark

The strength of a mark is assessed by whether it uniquely identifies the source of a product. *Star Indus., Inc.*, 417 F.3d at 384.  A mark identifies the source of a product if it is distinctive.  *Id.*

Courts use the following five categories to evaluate the distinctiveness of a mark: generic, descriptive, suggestive, arbitrary, and fanciful.  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999).  The Second Circuit has explained that

> [a] mark is generic if it is a common description of products and refers to the genus of which the particular product is a species.  A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put.  A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods.  An arbitrary mark applies a common word in an unfamiliar way.  A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Id.*  Under this analysis, Plaintiff's "AMBI" mark is a fanciful mark, as it is not a real word but was invented for its use as a mark.  Thus, Plaintiff's mark is distinctive.

In any event, when the USPTO registers a mark without requiring proof of secondary meaning, a presumption arises that the mark is more than merely descriptive but is, rather, inherently distinctive.  *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *PaperCutter, Inc.*, 900 F.2d at 563; *see also* 15 U.S.C. § 1115(a).  A party challenging the validity of the mark has the burden to rebut this presumption by a preponderance of the evidence. *Lane Capital Mgmt., Inc.*, 192 F.3d at 345.  Here, Plaintiff registered its mark with the USPTO, and Defendants have not asserted that the USPTO required proof of secondary meaning, a fact that the court will not presume.  Accordingly, Plaintiff receives the benefit of the presumption that its mark is distinctive.  Defendants have presented no evidence to rebut this presumption.  Therefore, regardless of which analysis the court applies, Plaintiff has a strong mark.

### (2) Actual Confusion

Actual confusion can be inferred from the fact that IBE sold its AMBI Green and Red products in response to specific customer requests for the genuine items. Defendants' customers were "actually confused" and believed the AMBI Green and Red products they purchased were authentic. Accordingly, the actual confusion factor favors Plaintiff.

### (3) Quality of Defendant's Products

Plaintiff provided evidence, undisputed by Defendants, that Defendants' products contained just trace amounts (0.03-0.04%) of the active skin bleaching ingredient hydroquinone. Plaintiff's product contained 2% hydroquinone levels. Because AMBI Green and Red are skin discoloration and toning creams, the fact that Defendants' products barely contained any of the active skin bleaching ingredient strongly tips the scales in Plaintiff's favor with respect to the quality factor.

### (4) Sophistication of Customers

Neither party provides evidence concerning the sophistication of the consumers of AMBI Green and Red, but Plaintiff argues that Defendants' products resembled Plaintiff's products so closely that the average consumer would not be able to discern any difference between the products. This argument is persuasive. If a counterfeit product is nearly identical to the genuine product, as Defendants concede is the case here, an average consumer cannot be expected to distinguish between the two. Accordingly, this factor weighs in favor of the Plaintiff.

### (5) Bad Faith

Defendants contend that they did not act in bad faith because they purchased and sold counterfeit AMBI Green and Red under the belief that those products were genuine AMBI Green and Red products. Plaintiff alleges that Defendants were willfully blind to the fact that the products

were counterfeit and acted with wrongful intent.

Defendants highlight, and Plaintiff concedes, that there was a pilferage problem in Sara Lee's Jamaican factory and that small quantities of AMBI Green and Red entered the United States in the suitcases of street vendors. (Defs.' Opp. Memo at 4; *see* Huges Depo Tr. at 131:3-7; Plane Depo. Tr. at 229-331.) The implication Defendants appear to make here is that they believed their products were those leaving the Jamaican factory by way of pilferage and/or entering the United States through unauthorized importation. In other words, they claim that they did not believe they were dealing in *counterfeit* products but rather in *stolen*, black-market products. Either way, Defendants' conduct is less than commendable.

Notwithstanding, bad faith in this context must involve an intent to "sow confusion" or "deceive purchasers as to the source of the product." *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005); *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004). Plaintiff's concession concerning the problems of pilferage and unauthorized importation of Jamaica AMBI Green and Red permits the possibility that Defendants actually believed their products were genuine–but only until the factory closed in 1997. After the factory closed down, Defendants no longer had any reason to believe that the products they were receiving, which were no longer in production, were genuine. Defendants knew enough about the alleged source of their products to believe, as they appear to claim, that they were pilfered from the Jamaican factory. To maintain a remotely credible belief in this regard, Defendants must also have known that the factory was open and producing AMBI Green and Red. Thus, the reasonableness of Defendants' alleged belief ended with the factory's 1997 closure, a fact that they readily could have, and should have, discovered from Plaintiff's authorized distributor of AMBI products (from whom Defendants continued to purchase

other AMBI products) or from the suitcase sellers. In any event, certainly by the time Plaintiff discovered that Defendants were selling allegedly counterfeit AMBI Green and Red in 2002–four-to-five years after the closure of the Jamaican factory–Defendants simply could not have reasonably believed that their products were stolen rather than counterfeit. If they harbored such a belief, it could only be because of an abject willful blindness to the possibility that their products were counterfeit.

In addition, Defendants unabashedly state that "[u]pon learning of the lawsuit against the Retail Defendants in or about January 2003 and plaintiff's claim [that] the Ambi Red and Ambi Green products may be counterfeit, IBE did not want to have any problem so it discarded the remainder of its inventory of Ambi Red and Ambi Green." (Defs.' Opp. Memo at 24.) While the court declines, at this time, to explicitly draw an adverse inference based on this self-professed destruction of obviously relevant evidence,[29] Defendants' action, nonetheless, holds some sway in the court's consideration of whether Defendants acted in bad faith. The court is hard-pressed to see any reason why certain of the Defendants would destroy their products upon learning about the counterfeit charges brought against the Retail Defendants, except to conceal their wrongdoing in that regard. Moreover, the court takes notice that six (and possibly more) separate federal actions[30] have been brought against some or all of the defendants in this action for trademark

---

[29]Defendants were under a clear obligation to preserve the evidence they destroyed. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450 458 (2d Cir. 2007) (stating that "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation").

[30]*See Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242 (11th Cir. 2002); *Martal Cosmetics, Ltd.*, 01-CV-7595 (E.D.N.Y.) (currently pending); *IKB Indus. Nig. Ltd. v. Int'l Beauty Exch.*, 01-cv-956 (E.D.N.Y.) (closed 4/1/2003); *Aini v. Sun Taiyang Co.*, 964

infringement.[31] While these other cases alone do not definitively demonstrate that Defendants acted in bad faith here with respect to Plaintiff's trademark, they do present some evidence of Defendants' intent with respect to the AMBI Green and Red goods that they acquired and sold. At a minimum, these lawsuits should have served to instruct Defendants to exercise greater diligence in ensuring that the products they sold, particularly those they received from questionable sources, did not infringe on others' trademarks.

Based on the foregoing facts and evidence, the court finds that a reasonable trier of fact could only conclude that Defendants acted in bad faith. Accordingly, as all of the relevant *Polaroid* factors favor Plaintiff, Plaintiff has demonstrated that there was a substantial likelihood of consumer confusion between Defendants' products and Plaintiff's products.

### c. "In Commerce"

It is undisputed that certain of the Defendants used Plaintiff's marks "in commerce" pursuant to 15 U.S.C. § 1114(a)(1). Defendants offer testimonial evidence and invoices to support their position that IBE and New King made inventory purchases of allegedly counterfeit AMBI Green and Red from Poblah and Infinity and that IBE also purchased these products from New King. In

---

F. Supp. 762 (S.D.N.Y. 1997); *Laboratorios. Roldan v. Tex Int'l, Inc.*, 902 F. Supp. 1555 (S.D. Fla. 1995); *O'Tentika Prods. v. ABCE Wholesale*, 90 Civ. 1923 (E.D.N.Y.) (closed 3/25/1992). Plaintiff also calls to the court's attention three additional cases that the court was not able to access using the conventional Internet database systems (*e.g.*, LEXIS/Westlaw). (*See* Pl.'s 56.1 ¶ 109, citing *Razac Prods. Co. v. Adolfo Holdings, Inc.*, 99 Civ. 2914 (S.D. Fla.); *Societe Int'l v. Aini*, 96 Civ. 9318 (S.D.N.Y.), 96 Civ 2629 (S.D. Fla.); *Aini v. Rapid, Inc.*, 93 Civ. 945 (S.D. Fla.).)

[31]Defendants argue that the history of trademark infringement actions brought against them is inadmissible in this action because it constitutes character evidence under Rule 404(a) of the Federal Rules of Evidence. However, this evidence is admissible as evidence of, *inter alia*, intent and knowledge under Rule 404(b). *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995).

addition, the Retail Defendants and Homeboys sold the products to individual consumers, including Plaintiff's investigators. Accordingly, there is no question that IBE, Homeboys, and the Retail Defendants used Plaintiff's marks in commerce.

However, Defendants present evidence sufficient to raise an issue of fact regarding whether ICE, M. Aini, and Choul were involved in the use of Plaintiff's mark in commerce. Plaintiff claims that ICE distributed, sold, and/or offered for sale counterfeit AMBI Green and Red, as evinced by the *Martal* videotape, discussed earlier, which revealed that allegedly counterfeit AMBI Green and Red were stored in IBE and ICE's shared warehouse.[32] (Pl.'s Exh. 25; Pl.'s Opp. Memo at 4.) Plaintiff, moreover, contends that IBE and ICE act as a single entity because they share warehouse space, expenses, and employees, and ICE's liability can thus be predicated on a finding that IBE infringed Plaintiff's trademark. (Pl.'s 56.1 ¶¶ 115-118; 122; 124-125.) Plaintiff's theory of liability with respect to Choul is premised on its ownership of IBE and ICE's shared place of business and warehouse. (Pl.'s Memo at 7-8.) Defendants, on the other hand, point out that IBE is a wholesaler of health and beauty products, and ICE is an importer of health and beauty products that only sells to wholesalers, including IBE. (*See* Def.'s 56.1 ¶ 116; M. Aini Depo. Tr. at 26:13-25.) Despite any shared expenses and space, Defendants contend, IBE and ICE maintain separate identities. It is conceivable to the court that two businesses may share certain expenses and even office and warehouse space and yet remain separate. Thus Plaintiff's evidence is insufficient to satisfy its

---

[32] *See* Magistrate Judge Chrein's July 24, 2002 Report and Recommendation, at page 12, in the *Martal* action, finding that "the third space [housing the allegedly counterfeit product in that case (and also, incidentally, the counterfeit AMBI Green and Red products at issue in this action)] was part of the 56-25 Warehouse, and further that the goods in that area were under the control of the Defendants" in that case, namely (among others), H. Aini, J. Aini, R. Aini, IBE, ICE, and Homeboys. (*See* Pl.'s Exh. 43.)

burden, as a matter of law, to show that Choul, ICE, and M. Aini (whose liability would be based on the fact that he is the president and sole shareholder of ICE) were involved in the purchase and sale of counterfeit AMBI Green and Red.

With respect to H. Aini and J. Aini, it is well-settled that "personal liability for trademark infringement and unfair competition is established if the officer is a moving, active conscious force behind [the defendant corporation's] infringement." *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988) (internal quotation marks and citation omitted, bracketed text in original). H. Aini, as the president and sole shareholder of IBE, and the only individual with check writing authority on behalf of IBE (*see* Pl.'s 56.1 ¶ 119; H. Aini Depo. Tr. at 107:12-20), is undoubtedly the "moving, active conscious force" behind IBE's infringement. *See Calvin Klein Jeanswear Co. v. Tunnel Trading*, No. 98 Civ. 5408, 2001 WL 1456577, at *6 (S.D.N.Y. Nov. 16, 2001) (holding that a defendant who was the sole corporate officer and employee of a company "unarguably served as the 'moving, active, conscious force'" behind the company's actions). J. Aini's exact role in IBE and ICE is in dispute. Plaintiff claims that J. Aini works as a buyer for IBE and ICE and, as such, is the "eminence" behind both IBE and ICE. (Pl.'s 56.1 ¶ 130, 132.) Defendants, however, assert that J. Aini is a mere consultant to IBE and ICE and is not an active force behind any trademark infringement by IBE or ICE. (ICE Memo[33] at 11.) The record reflects that J. Aini did act in some capacity on behalf of IBE and that he acted as a buyer for ICE, with the ability to enter into binding contracts for ICE. (*See, generally,* J. Aini Dep. Tr.; Pl.'s Exh. 6.) However, J. Aini's precise role in purchasing and selling counterfeit AMBI Green and Red, and

---

[33] "ICE Memo" refers to the document entitled "ICE/Aini Defendants' Memorandum of Law in Support of Motion for Summary Judgment."

whether he was a "moving, active conscious force" behind any infringement by ICE remains a question of fact appropriate for determination by a jury. Thus, summary judgment against J. Aini is not warranted.

Plaintiffs have established the ownership, likelihood of confusion, and commerce elements against IBE, H. Aini, Homeboys, and the Retail Defendants ("Violating Defendants"). Accordingly, summary judgment is granted in favor of Plaintiff against the Violating Defendants on the issue of trademark infringement under the Lanham Act. However, Plaintiff has not proven these elements with respect to the remaining defendants, and summary judgment against ICE, M. Aini, J. Aini, and Choul consequently is denied.

## C.      Plaintiff's State Claims

Plaintiff also charges Defendants with violations of New York's anti-dilution statute (New York General Business Law section 360-l) and New York unfair competition and unjust enrichment common law, and further charges Choul with a violation of New York Real Property Law section 231(2).

### 1.      Anti-Dilution Statute

Under New York General Business Law section 360-l,

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

To prevail on a claim under this section, (1) "plaintiff's mark must possess a distinctive quality capable of dilution," and (2) "plaintiff must show a likelihood of dilution." *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1090 (S.D.N.Y. 1993) (citations omitted).

"Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Mead Data Central, Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) (citations omitted). The court's analysis, *supra*, of the strength of the AMBI mark thus applies here. As the court found earlier, Plaintiff's mark is distinctive. Accordingly, the mark is capable of dilution, and the first element of Plaintiff's dilution claim is satisfied.

With respect to the second element, dilution is "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Central, Inc.*, 875 F.2d at 1031 (citation omitted). There is no question as to whether blurring has occurred, as Defendants claim that the products they sold actually bore Plaintiff's mark. Moreover, Defendants' products tarnish Plaintiff's mark because of the inferior quality of Defendants' products, particularly with respect to the hydroquinone content, as described earlier in detail. Therefore, the second element of Plaintiff's dilution claim is also satisfied.

Accordingly, the court finds that Defendant has violated New York's anti-dilution statute.

## 2. Unfair Competition and Unjust Enrichment

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Kraft Gen. Foods v. Allied Old English*, 831 F. Supp. 123, 135 (S.D.N.Y. 1993) (internal quotation marks and citation omitted). The unfair competition claim "is governed by essentially the same considerations as [the] infringement claim." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975); *see also Acad. Award Prods., Inc. v. Bulova Watch Co.*, 90 F. Supp. 12, 13 (S.D.N.Y 1950) (holding that, while "there can be unfair competition without the existence of trademark infringement . . .

there cannot be any trademark infringement without the presence also of those acts which amount to unfair competition.")  Accordingly, as the court has already determined, *supra*, that Defendants' conduct was likely to cause confusion and deceive purchasers as to the origin of the goods, and that Defendants acted in bad faith, the court now finds that Defendants engaged in unfair competition under New York law.

The court need not address Plaintiff's unjust enrichment claim because Plaintiff does not seek to recover Defendants' profits.[34]

### 3.    Landlord Liability

With respect to Plaintiff's landlord liability claim, Plaintiff has failed to present facts demonstrating that Choul "knowingly" leased the premises for unlawful activity, as is required under New York Real Property Law 231(2).  *See* N.Y. CONSOL. LAW § 231(2) (McKinney 2006).  Summary judgment on this claim is thus denied.

### D.    Remedies

### 1.    Permanent Injunction

The facts establish that the Violating Defendants have infringed on Plaintiff's trademark under the Lanham Act.  As it is clear that the Violating Defendants will otherwise continue purchasing and selling goods bearing Plaintiff's infringed trademark, they are hereby permanently enjoined under section 1116(a) of the Lanham Act from buying, selling, advertising, or otherwise

---

[34]The court notes, in any event, that Plaintiff probably has made an insufficient showing for unjust enrichment.  *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1538 (2d Cir. 1992) ("[A] defendant becomes accountable for its profits when the plaintiff can show that, were it not for defendant's infringement, the defendant's sales would otherwise have gone to the plaintiff.").

dealing in goods bearing the infringed marks, but are permitted to continue any authorized purchase, sale, distribution, and advertising of genuine AMBI products. *See* 15 U.S.C. § 1116(a); *see also Collins v. Aztar Corp.*, No. 99-7912, 2000 WL 302982, at *1 (2d Cir. Mar. 20, 2000) ("[P]ermanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in the future."). Plaintiff is released from its preliminary injunction bond.

Plaintiff is further permitted to destroy the seized counterfeit AMBI Green and Red products now being held in storage pursuant to the seizure order issued by Judge Gleeson on December 20, 2002. *See Fendi S.A.S. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1146-47 (S.D.N.Y. 1986) (permitting the plaintiff to destroy seized counterfeit goods following the court's grant of a permanent injunction against the defendant from "buying, selling, advertising or otherwise dealing in" such goods).

## 2. Statutory Damages

The Lanham Act permits plaintiffs, pursuant to 15 U.S.C. § 1117(c), to elect statutory damages rather than recover actual damages and defendants' profits, as authorized under 15 U.S.C. § 1117(a)-(b).[35] Plaintiff, here, has made such an election. JJCC urges an award of maximum statutory damages under 15 U.S.C. § 1117(c)(2), which provides that "if the court finds that the use of the counterfeit mark was willful," the court may award "not more than $1,000,000 per counterfeit

---

[35]Defendants argue that statutory damages are not available in the type of case that is currently before the court because Defendants are not charged with *manufacturing* products bearing Plaintiff's trademark but merely with *distributing and selling* allegedly counterfeit products. Defendants provide no legal support for this contention. Furthermore, Defendants' argument directly contradicts the language of the Lanham Act, which expressly provides statutory damages for "the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(c).

mark per type of goods or services sold." *See* 15 U.S.C. § 1117(c)(2).[36] "Willful blindness" satisfies the willfulness requirement. *See Tony Jones Apparel, Inc. v. Indigo USA LLC*, No, 03 C 0280, 2005 2005 WL 1667789, at *8 (N.D. Ill. July 11, 2005) (citing *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992)). Moreover, "[w]illful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights." *Id.*

The court has found that the Violating Defendants distributed counterfeit products in violation of the Lanham Act, and did so with at least a willful blindness, or a reckless disregard for Plaintiff's rights. Accordingly, Plaintiff may be awarded "not more than $1,000,000 per counterfeit mark per type of goods or services sold," as articulated in 15 U.S.C. § 1117(c)(2). The court hereby refers the calculation of the damages award to United States Magistrate Judge Roanne L. Mann in accordance with this Opinion and Order.

### 3.        Attorneys' Fees, Costs, Prejudgment Interest

Plaintiff seeks attorneys' fees, prejudgment interest, and costs, including the expense of hiring investigators. Plaintiff is entitled to "costs of the action" under 15 U.S.C. § 1117(a), as well as appropriate prejudgment interest, the determination of which is also hereby referred to Magistrate Judge Mann.

With respect to attorneys' fees, 15 U.S.C. § 1117(a) permits the prevailing party to recover attorneys' fees in "exceptional cases." Although the court finds that Defendants acted at least with

---

[36]For non-willful infringement, the statutory minimum recovery is $500, and the maximum is $100,000 per counterfeit mark per type of goods sold. 15 U.S.C. § 1117(c)(2); *see also Tony Jones Apparel, Inc.*, 2005 WL 1667789, at *8.

a willful blindness toward the possibility that they were infringing on Plaintiff's mark, this case is not an "exceptional" case that mandates the court to award attorneys' fees. *See Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 254 (S.D.N.Y. 2004) (concluding that "defendants acted in bad faith," but declining to deem that case "exceptional" and denying attorneys' fees); *Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999) (stating that "the sort of misconduct that supports an attorney fees award includes not only willful infringement, but also willful defiance and protraction of judicial processes attempting to stop the illegalities"). Therefore, Plaintiff's request for attorneys' fees is denied.

## E. Defendants' Summary Judgment Motion

ICE, J. Aini, M. Aini, and R. Aini ("Moving Defendants") argue that they should be dismissed from this action because Plaintiff has failed to present evidence demonstrating that they manufactured, distributed, sold, or purchased counterfeit AMBI Green and Red products. Plaintiffs counter that ICE and IBE acted as a single entity and that J. Aini, M. Aini, and R. Aini were the "moving, active conscious force" behind any trademark infringement carried out by IBE, ICE, and/or Homeboys and should thus be held liable.

With respect to ICE, as determined earlier, there is a genuine issue of fact regarding whether it distributed, sold, or offered for sale counterfeit AMBI Green and Red. Accordingly, dismissal of ICE is inappropriate at this stage.

With respect to J. Aini, M. Aini, and R. Aini, also as noted earlier, "personal liability for trademark infringement and unfair competition is established if the officer is a moving, active conscious force behind [the defendant corporation's] infringement." *Bambu Sales, Inc.*, 683 F. Supp. at 913 (internal quotation marks and citation omitted, bracketed text in original). Moving

Defendants contend that dismissal is warranted because Plaintiff did not present evidence that J. Aini, M. Aini, or R. Aini was the "moving, active conscious force" behind any trademark infringement that may have been carried out by IBE, ICE, or Homeboys. The court disagrees.

As the president, sole shareholder, and only full-time employee of ICE, M. Aini is the "moving, active, conscious force" behind ICE's activities and conduct. *See Calvin Klein Jeanswear Co.*, 2001 WL 1456577, at *6 (holding that a defendant who was the sole corporate officer and employee of a company "unarguably served as the 'moving, active, conscious force'" behind the company's actions). Because ICE is not dismissed from this action, neither is dismissal of M. Aini warranted.

Defendants argue that Plaintiff attempts to predicate liability against J. Aini on the mere fact that he does some work as a "consultant" for ICE and that he is a brother of M. Aini and H. Aini. Plaintiff, on the other hand, counters that J. Aini is the eminence behind ICE and IBE because he allegedly works as a buyer for both companies, has a significant background and knowledge in the cosmetic industry, which he uses to help his brothers' businesses, works a few hours per day at IBE's premises, and has the authority to bind ICE in contractual arrangements as an agent of ICE. Accepting Plaintiff's version of the facts, there is a triable issue regarding whether J. Aini was a primary force behind the distribution and sale of counterfeit AMBI Green and Red products. *See Playboy Enters. v. Starware Publ'g Corp.*, 900 F. Supp. 438, 440-441 (D. Fla. 1995) (in a copyright infringement case, holding that "[a]n individual . . . who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement"); *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117, at *17 (N.D. Cal. Aug. 17, 2004) (stating that "employees are personally liable

34

for the corporation's copyright and trademark infringements when they are a "moving, active conscious force" behind the corporation's infringement").

Defendants claim that R. Aini cannot be subject to liability under the Lanham Act because she is only a part-time employee at Homeboys. Plaintiffs allege that R. Aini held buyer and management positions with Homeboys during the period that Homeboys purchased counterfeit AMBI Green and Red. (Pl.'s Opp. Memo at 19.) Plaintiff further points out that R. Aini was a defendant in the *Martal* action, also a trademark infringement case, in which she also moved for summary judgment to dismiss the claims against her for reasons similar to those articulated in Moving Defendants' motion here. In a September 9, 2003 Report and Recommendation[37] issued in the *Martal* action, Magistrate Judge Chrein denied R. Aini's motion, finding that the evidence presented to the court "strongly supports . . . that R. Aini holds a high-level position with Homeboys" and that she was a buyer of health and beauty products for ICE and Homeboys during essentially the same period spanned by the relevant events in this case.[38] Accordingly, there is at least an issue of fact concerning whether R. Aini was a buyer and manager with ICE and Homeboys and, as such, a "moving, active, conscious force" behind any trademark infringement activities conducted by ICE and Homeboys.

Moving Defendants' summary judgment motion is thus denied.

**F.      Defendants' Request to Suppress Evidence**

Defendants request that the court strike certain evidence from the record. Except for those

---

[37]*See* Exh. A to the 5/17/2006 Affidavit of Rodney A. Brown.

[38]Magistrate Judge Chrein's Report and Recommendation was adopted in full by District Judge Gleeson on October 16, 2003.

already ruled upon herein, the court defers its ruling concerning the suppression of any additional evidence until such time that it becomes necessary.

G.     **Conclusion**

For the reasons set forth above, the court grants Plaintiff summary judgment against IBE, H. Aini, Homeboys, and the Retail Defendants with respect to Plaintiff's Lanham Act claims, as well as its state law dilution and unfair competition claims. Plaintiff's request for injunctive relief is thus granted as to those aforementioned defendants, to the extent described herein. However, Plaintiff's summary judgment motion against ICE, M. Aini, J. Aini, R. Aini, and Choul is denied. In addition, Plaintiff's request for summary judgment on its state law unjust enrichment and landlord liability claims is denied, as is its request for attorneys' fees.

Summary judgment for ICE, M. Aini, J. Aini, and Choul against Plaintiff is also denied. Plaintiff is released from its preliminary injunction bond and is further permitted to destroy any seized counterfeit AMBI Green and Red products in its possession.

The court hereby refers to Magistrate Judge Mann the calculation of Plaintiff's statutory damages award, costs of this action, and prejudgment interest, in accordance with this Opinion and Order, as well as any further proceedings.

SO ORDERED.


DATED:     Brooklyn, New York
           March 25, 2008


                              _____/s/_____
                                      DORA L. IRIZARRY
                                  United States District Judge